IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Crim. No. 08-075-SLR |
| ) | |
| TEDDY COPPEDGE, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM ORDER**

**I. INTRODUCTION**

On May 6, 2008, defendant Teddy Coppedge was indicted on one count of possession of a firearm by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (D.I. 9) The charges emanate from evidence obtained pursuant to a stop and search of defendant and his vehicle by members of the Wilmington Police Department ("WPD") regarding a traffic violation on April 8, 2008. Defendant moves for suppression of evidence and statements, arguing that the case rests on the "dubious proposition that a convicted felon would give voluntary consent to the search of his vehicle, knowing that the vehicle contained drug and gun contraband." (D.I.18) In contrast, plaintiff avers that the stop and search were based on reasonable suspicion and the contraband recovered was the result of defendant's consent to search his person and vehicle. (D.I. 17) Likewise, plaintiff contends there was no 5th Amendment violation because defendant was not subjected to custodial interrogation, warranting

*Miranda* warnings. An evidentiary hearing was conducted on August 12, 2008.[1] (D.I. 20) The matter is fully briefed. (D.I. 17, 18, 19) The court has jurisdiction pursuant to 18 U.S.C. § 3231. For the reasons that follow, defendant's motion will be denied.

## II. FINDINGS OF FACTS

Pursuant to Federal Rules of Criminal Procedure 12(d), the following constitutes the court's essential findings of fact.

1. On April 8, 2008, Riley and his partner, Detective Cunningham ("Cunningham"), were on undercover patrol in the area of Sixth and West Streets in the City of Wilmington, Delaware.[2] (*Id.* at 6, 13, 15) Both detectives were dressed in plainclothes, riding in an unmarked police vehicle. (*Id.* at 4, 7) While on routine patrol in this residential area, Riley noticed a white Buick ("Buick") traveling on Sixth and West Streets. The Buick's front and rear windows were tinted, with the rear windows slightly darker than the front. (*Id.* at 4, 15) From about 300 feet away, Riley observed defendant[3] exit the Buick to speak with an unknown black male ("unknown male") at Sixth and West Streets. (*Id.* at 4, 15, 18) The two men had a short conversation before defendant got back into the Buick and drove toward the 200 block of West Eighth

---

[1]Testifying on behalf of plaintiff was Todd Riley ("Riley"), a WPD detective currently assigned to the Drug Organized Crime and Vice Division, where his responsibilities include conducting drug investigations and open air drug investigations in a plainclothes capacity. (*Id.* at 3, 13) During his career, Riley has stopped over 30 individuals for traffic violations. (*Id.* at 22)

[2]Riley described this area as residential. (*Id.* at 17) It is unclear from the record the time of day these events transpired.

[3]Riley identified this individual as defendant. (*Id.* at 4)

2

Street. (*Id.* at 5, 18) The unknown man got into another car and drove in the same direction. (*Id.* at 18) Riley and Cunningham followed the Buick. (*Id.* at 5)

2. Defendant stopped to park the Buick around the 200 block of West Eighth Street. (*Id.* at 5, 19) Riley observed the unknown male reappear and walk over to a parked, black Mercedes with New York registration ("the Mercedes"). (*Id.* at 5) The unknown male entered the Mercedes, removed a black book bag and proceed to walk into a barbershop, with defendant following behind. (*Id.* at 5, 19)

3. A short time later, defendant exited the barbershop and returned to the Buick where he sat in the driver's seat for several minutes. (*Id.* at 5-6, 19, 21) Riley did not observe anyone else inside the Buick, and thought that defendant appeared to be looking at something in his lap. (*Id.* at 7, 20-21)

4. Defendant then started the Buick and drove west on Eight Street. At the intersection of Eighth and Washington Streets, Riley watched defendant proceed, without stopping, through a red traffic signal. (*Id.* at 6) Defendant then parked the Buick along the south side of the 600 block of West Eighth Street.[4] Riley and Cunningham pulled their vehicle over; Cunningham watched defendant while Riley watched the traffic light cycle through, twice, before concluding that it was functioning properly. (*Id.* at 6, 19) Riley decided not to stop defendant immediately for the traffic violation because their police vehicle was not equipped with emergency lights or police identification. (*Id.* at 7, 22) Riley tried to contact a marked police car to conduct the traffic stop of defendant, but no patrol cars were immediately available.

---

[4]Riley described where he stopped defendant as a high crime and drug area where he and Cunningham have made several drug arrests. (*Id.* at 13)

3

5. Defendant, while talking on a cell phone, exited the Buick and walked across to the north side of the street. (*Id.* at 6, 24) Riley and Cunningham decided to effect the stop themselves because defendant was walking away from the area; they radioed this information into WPD. (*Id.* at 6-8) After donning police vests (with "POLICE" written across front and back), they stopped defendant on the north side of the street. (*Id.* at 7-8, 24) Defendant offered no resistance and was handcuffed and seated on the ground.[5] (*Id.* at 8, 26, 32) Defendant was visibly shaken and upset. (*Id. at 8)* Riley testified that: (a) defendant was handcuffed to prevent him from fleeing and for police safety; and (b) at this point, defendant was being detained for the traffic violation and, once the ticket was issued, he would be free to leave. (*Id.* at 8, 26) A marked vehicle arrived within a few minutes of the stop. (*Id.* at 32)

6. Riley asked defendant how he arrived in the area.[6] (*Id.* at 8-9, 27) Defendant responded that he had walked there. (*Id.* at 9) Riley then asked if defendant had anything illegal in his possession. (*Id.* at 30) Defendant responded in the negative, and then consented to a search of his person. (*Id.* at 9, 30) Inside defendant's pocket, Riley found a key that defendant said belonged to his cousin's car, parked at another location in Wilmington. (*Id.*) After Riley inquired about the Buick parked across the street, defendant said he was lying and that the keys actually

---

[5] Riley testified that, in similar situations, he applied handcuffs to individuals. (*Id.* at 8)

[6] The questions asked were, according to Riley, typical of those used when he detains a subject. Riley did not administer *Miranda* warnings prior to asking questions because it was a "normal traffic stop . . . the only thing he [was] being detained and arrested for is traffic violations." (*Id.* at 11) The record does not reflect that any questions regarding name, address or other pedigree information were asked.

4

belonged to the Buick. (*Id.* at 10) Defendant explained that he lied because he was nervous. (*Id.* at 32)

7. Based on his observations of defendant's activity and the lie about the key, Riley became suspicious that defendant was involved in other illegal activity. (*Id.* at 31) Riley asked defendant if there was anything in the Buick that he should know about, to which defendant replied that there was a small amount of "bud"[7] in the center console. (*Id.* at 9-10) Riley testified that, prior to walking over to the Buick, defendant consented to a search of the Buick. (*Id.* at 10)

8. Arriving at the Buick, Riley observed a green, plant-like substance in the center console.[8] (*Id.* at 11, 33) Inside the Buick, Riley found a key to the glove box. Riley used the key to open the glove box and discovered: a plastic bag containing approximately 40 grams of marijuana, and another plastic bag containing a loaded handgun concealed within a black and blue wool glove. (*Id.* at 11)

9. Defendant was placed under arrest and transported to the WPD station where Riley administered *Miranda* warnings. (*Id.* at 12) Defendant signed a *Miranda* form, indicating he understood his rights and, subsequently, was interviewed and provided statements to the police. (*Id.* at 11-12)

### III. CONCLUSIONS OF LAW

1. Once a defendant has challenged the legality of a warrantless search and seizure, the burden is on the government to demonstrate that the acts were

---

[7] Based on his training and experience, Riley understood this to mean marijuana.

[8] Field tested positive as two grams of marijuana. (*Id.* at 10)

5

constitutional. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995); *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). The burden of proof is a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n. 14 (1974). The government bears the burden of showing, by a preponderance of the evidence, that any statements made to law enforcement officers were voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

 2. The Fourth Amendment of the United States Constitution prevents "unreasonable searches and seizures."[9] A seizure made pursuant to a warrant based on probable cause is generally reasonable. *Katz v. United States*, 389 U.S. 347, 356-357 (1967). Warrantless searches are presumed unreasonable. *Id*. Evidence obtained pursuant to a warrantless search that does not meet an exception to the warrant requirement must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963); *United States v. Brown*, 448 F.3d 239, 244.

 3. It is undisputed that a law enforcement officer may lawfully stop a vehicle after observing a violation of state traffic laws. *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977); *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004). Reasonable suspicion is required to support an investigatory traffic stop under the Fourth Amendment. *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (joining

---

[9]"The initial step of a Fourth Amendment suppression analysis requires us to determine the timing of the seizure." *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008). The Fourth Amendment becomes relevant the moment the seizure occurs. *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006).

other circuit courts in concluding that "probable cause" not required as predicate for traffic stop). "Normally, reasonable suspicion to stop a vehicle and detain its occupants usually flows from a police officer's contemporaneous observation of a violation of motor vehicle laws." *United States v. Johnson*, Crim. No. 08-CR-18, 2008 WL 4287288 (M.D. Pa Sept. 17, 2008).

    4. "After a traffic stop that was justified at its inception, an officer who develops a reasonable articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003). "In order to minimize the dangers faced by police officers conducting traffic stops, the Court has extended the constitutional principles in *Terry*[10] to situations involving officers and motorists." *United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997). To that end, the officer may conduct a limited protective pat down search of a suspect's outer clothing for concealed weapons when the suspect gives the officer reason to believe that he may be armed and presently dangerous. *Terry*, 392 U.S. at 27-30. Because a primary purpose of such a search is the protection of the law enforcement officer, in order for the search to be justified, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences drawn from those facts, reasonably warrant the intrusion." *Id.* at 21. The pat down must be limited in scope to a search for weapons. *Id.* at 26.

---

[10]*Terry v. Ohio*, 392 U.S. 1 (1968).

5. When police officers conduct a *Terry* stop, "they may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo.'" *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)). When considering whether a *Terry* stop has escalated into an arrest, "the reasonableness of the intrusions is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1192 (3d Cir. 1992). There is no per se rule that handcuffing people constitutes an arrest. *United States v. Prince,* 157 F. Supp.2d 316, 325 (D. Del. 2001).

6. In light of this authority, the court finds there was reasonable suspicion to support the stop of defendant for failure to stop at a traffic light. In so doing, the court credits Riley's testimony and notes the absence of contradictory evidence. *United States v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993) (credibility determinations as well as the weight given to evidence is within the province of the district court). This initial finding of reasonableness for the stop, however, does not end the court's inquiry because defendant asserts that he was subjected to custodial interrogation without the

administration of *Miranda*[11] warnings and, consequently, the consent given to search his person and the Buick "was not the product of his free choice." (D.I. 12 at 6)

7. Determining whether a suspect was subject to custodial interrogation is made on a case by case basis looking objectively at the totality of the circumstances. *Stansbury v. California*, 511 U.S. 318, 323 (1994). "The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers of the person being questioned." *Id.*

> Courts consider a variety of factors when determining if a person was in custody, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*United States v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006).

8. The record at bar evinces a quickly unfolding chronology of events, precipitated by defendant's exit from the Buick and walk across the street. It is unclear what, if anything, officers said to defendant as he was stopped, quickly handcuffed and seated on the ground, before Riley asked how he arrived at that location. *Miranda*

---

[11] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "It is hornbook law that the police must advise a suspect of his Fifth Amendment right to remain silent before initiating a custodial interrogation." *United States v. Green*, 541 F.3d 176, 186 (3d Cir. 2008). Specifically, before any questioning, the suspect must be informed that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. *Miranda*, 384 U.S. at 445. Any statements or testimonial acts made before "the administration and voluntary waiver of *Miranda* rights are 'irrebuttably presumed involuntary' and may not be used in the prosecution's case-in-chief." *Id.* (quoting *United States v. Pacheco-Lopez,* 531 F.3d 420, 424 (6th Cir. 2008)).

warnings are not required before officers request pedigree and biographical information, however, the record at bar does not reflect that such questions were even posed. See *Pennsylvania v. Muniz*, 496 U.S. 582, 600-02 (1990). Riley concluded that handcuffs were necessary for "officer safety" and to prevent defendant from fleeing the area; yet, his testimony does not detail the specific reasons he thought defendant would flee nor include a listing of the safety concerns implicated by the stop. Considering Riley's unrefuted testimony that the location of the stop was in a high crime and drug area, the court concludes that the application of handcuffs was reasonable and did not convert the stop into a custodial interrogation.

9. Having concluded that defendant was not subjected to custodial interrogation, the issue becomes whether defendant consented to the search of his person and the Buick. "[A] search conducted pursuant to consent is one of the specifically established exceptions to the warrant requirement." *United States v. Givan*, 320 F.3d 452, 459. The government bears the burden of proving that the consent was freely and voluntarily given. *Id.* The free and voluntary nature of a consent must be evaluated according to all of its surrounding circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). Critical factors to consider include the setting in which the consent was obtained, the parties' verbal and nonverbal actions, and the age, intelligence, and educational background of the consenting party. *United States v. Wilson*, 413 F.3d 382, 388 (3d Cir.2005). Evidence that police coercion induced a consent renders the consent invalid. *Schneckloth*, 412 U.S. at 229.

10. The record establishes that, after questioning by Riley, defendant consented to a search of his person and then of the Buick. Although defendant contends it incredible to believe that a convicted felon with concealed contraband would voluntarily consent to a search, this argument, alone, is insufficient for the court to discredit Riley's testimony.

## IV. CONCLUSION

At Wilmington this 10th day of November, 2008,

IT IS ORDERED that:

1. Defendant's motion to suppress is denied. (D.I. 12)

2. A telephone status conference is scheduled for **Friday, November 21, 2008** at **9:00 a.m.**, with the court initiating said call.

IT IS FURTHER ORDERED that the time between this order and **November 21, 2008** shall be excluded under the Speedy Trial Act, 18 U.S.C. § 3161, et seq.

United States District Judge